## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

   vs.                                      No. **CR 06-264 MCA**

**VICTOR CHAVEZ**, and
**SERVANDO MORENO**,

       Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTIONS TO SUPPRESS

     **THIS MATTER** came before the Court on *Defendant Victor Chavez's Motion to Suppress Evidence* [Doc. 36] filed on May 23, 2006, and joined by Defendant Servando Moreno [Doc. 41] on June 15, 2006, and *Defendant Victor Chavez's Motion to Suppress Statements and Evidence* [Doc. 47] filed on June 26, 2006.  The Court held evidentiary hearings on these motions in Albuquerque, New Mexico, on August 29, 2006, and August 31, 2006.  [Doc. 56, 58.]  Having fully considered the pleadings of record, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being fully advised in the premises, the Court **DENIES** Defendants' motions based upon the findings of fact and conclusions of law set forth below.

## I.   <u>FINDINGS OF FACT</u>

1.      In the months leading up to January 19, 2006, agents of the United States Drug Enforcement Administration (DEA) were investigating Defendant Servando Moreno's alleged involvement in drug trafficking.

2.      Working in conjunction with a confidential source who communicated with Defendant Moreno via monitored telephone calls on or about January 18, 2006, Agent Maulden of the DEA posed as a prospective customer and made arrangements to purchase one kilogram of cocaine from Defendant Moreno at a meeting in Santa Rosa, New Mexico, the following morning.

3.      Through the monitored telephone calls, the confidential source informed the DEA agents that Defendant Moreno's plan was to get a driver to take him to Santa Rosa on January 19, 2006, and that Defendant Moreno had provided a telephone number for the driver but not a name.

4.      Through his research of telephone records, Agent Maulden was able to identify the driver's telephone number supplied by the confidential source as belonging to Defendant Victor Chavez.[1]

---

[1]After the suppression hearing, Defendant Chavez submitted an affidavit [Doc. 57] claiming that the contract for this telephone number was under his father's name, Victor Chavez, Sr., and that the Draxton Street address listed on the contract was actually his father's address.   The credibility of these statements is questionable given that Defendant Chavez never gave the Government the opportunity to test them through cross-examination.  In any event, I find that under the totality of the circumstances, Defendant Chavez's affidavit does not provide any grounds for suppressing evidence or statements in this case.

5.    The DEA agents had worked with the confidential source involved in this purchase on previous occasions, and this prior experience (as well as their monitoring of the confidential source's telephone communications) gave them the opportunity to test this confidential source's reliability.

6.    Based on their prior experience working with the confidential source, the DEA agents and task force officers credibly testified that the confidential source was reliable.

7.    On the morning of January 19, 2006, DEA agents conducted visual surveillance of Defendant Moreno's activities and monitored the confidential source's telephone communications with Defendant Moreno.

8.    While monitored by the DEA agents, the confidential source made a telephone call to Defendant Moreno at approximately 9:20 a.m., at which time Defendant Moreno told the confidential source that he was still at the trailer where he resided.

9.    The DEA agents corroborated this information when they observed a man matching Defendant Moreno's description enter and exit the trailer that morning before getting into an orange pickup truck and driving to another location at approximately 9:30 a.m.

10.    The orange pickup truck observed by the DEA agents matched the description the confidential source had given them of the vehicle that Defendant Moreno customarily drove.

11.    Defendant Moreno drove the orange pickup truck to a location at 319 Riverside in the South Valley area of Albuquerque, where the pickup truck disappeared from the DEA

agents' view as it went behind a stucco fence and down a long driveway leading behind a house.

12.     Approximately fifteen to twenty minutes later, the DEA agents observed a white pickup truck emerge from the 319 Riverside address and travel to a gas station at the corner of Broadway and Bridge.

13.     When the white Ford pickup truck arrived at the gas station and parked next to one of the fuel pumps, one of the DEA agents observed that the truck was carrying two occupants: a driver (later identified as Defendant Chavez) and a passenger who matched the description of Defendant Moreno and appeared to be the same person who drove the orange pickup truck to the 319 Riverside address earlier that morning.

14.     During the span of approximately twenty minutes between the time that the orange pickup truck entered the 319 Riverside address and the time the white Ford pickup truck left the gas station, the confidential source placed a call to Defendant Moreno while being monitored by DEA agents; during this call the confidential source was told that Defendant Moreno was leaving Albuquerque en route to Santa Rosa.

15.     After the white Ford pickup truck left the gas station with the two occupants identified above, the DEA agents observed the truck with its two occupants driving north onto Interstate 25 and then east on Interstate 40 in the direction of Santa Rosa, New Mexico.

16.     The agents' visual surveillance of the white Ford pickup truck and its occupants corroborated the information they had obtained by monitoring the confidential source's telephone communications with Defendant Moreno; specifically, Defendant Moreno

was seen heading east from Albuquerque in the direction of Santa Rosa with a driver in accordance with the plan disclosed by the confidential source.

17.    After the white Ford pickup truck turned eastbound onto Interstate 40, one of the DEA agents contacted Officer Chavez of the New Mexico State Police and directed him to conduct a traffic stop of that vehicle without disclosing to its occupants that the stop was based on the DEA investigation.

18.    The agents' and officers' purpose in detaining the white Ford pickup truck and its occupants by means of a traffic stop was to protect the integrity of the DEA investigation and, more specifically, to avoid disclosing information which would allow the Defendants or their associates to readily determine the confidential source's identity while that investigation was still underway and the confidential source's safety could be jeopardized.

19.    Officer Chavez proceeded to conduct a traffic stop of the white Ford pickup truck and its occupants between approximately 10:30 a.m. and 11:00 a.m. on or about January 19, 2006, while that vehicle was traveling past the eastern outskirts of Albuquerque on Interstate 40 headed in the direction of Santa Rosa, New Mexico.

20.    Although Officer Chavez later told the occupants that he pulled them over because the white Ford pickup truck did not have its headlights on in a "safety corridor," the officer did not observe any actual traffic violation before conducting the traffic stop.

21.    When Officer Chavez engaged the emergency lights on his marked state police vehicle, the white Ford pickup truck responded by pulling over to the side of the highway and stopping.

-5-

22.     The ensuing traffic stop was recorded onto a videotape by means of a camera mounted on the dashboard of Officer Chavez's vehicle, and that videotape (as well as a DVD copy) were admitted into evidence at the hearing on August 29, 2006.  [Ex. 1, 1A.]

23.     The videotape reflects that the driver of the white Ford pickup truck identified himself as "Victor Chavez" and the passenger identified himself as "Servando Moreno."

24.     As part of the initial traffic stop, Officer Chavez also requested the driver's license, registration, and insurance papers and the passenger's identification card, which again confirmed their identities.

25.     In response to the officer's request for documents, Defendant Chavez indicated that he did not have proof of insurance.

26.     Officer Chavez then proceeded to write up a citation for lack of insurance, as well as a warning for the fictitious offense of driving in a "safety corridor" without headlights on.

27.     While preparing documentation for the warning and citation, Officer Chavez conversed with Defendant Chavez about his travel plans, and Defendant Chavez confirmed that he was traveling to Santa Rosa, New Mexico, without giving specific details about the name or addresses of the person he was going to meet there, or why Defendant Moreno was accompanying him.

28.     After issuing the warning and the citation, Officer Chavez asked Defendants for consent to search the pickup truck.

-6-

29.    At the time Officer Chavez requested their consent to search, Defendants were not under arrest, and Officer Chavez had not physically restrained Defendants or made any show of force comparable to an arrest.

30.    After reviewing the consent form and conversing with Officer Chavez, Defendants each consented to allow the officer and his dog "Chica" to search the pickup truck; Defendants made no discernible effort to resist the search or leave the scene.

31.    Neither Defendant was unlawfully detained, nor had any unlawful search occurred, at the time Officer Chavez requested and received Defendants' consent to search the vehicle.

32.    Considering the totality of the circumstances, the consent of each Defendant was knowingly and voluntarily given without duress or coercion, regardless or whether or not the Defendants were free to leave at the time their consent was given.

33.    After obtaining Defendants' consent, Officer Chavez proceeded to search the white Ford pickup truck with his dog "Chica."

34.    Without relying on his dog, Officer Chavez emptied the contents of an open bucket of nails that was located in the bed of the pickup truck; hidden within the bucket the officer found a rectangular, brick-shaped package the contents of which he readily identified as having the appearance of cocaine.[2]

------------------------------------------------

[2]The videotape of the traffic stop shows Officer Chavez displaying the package of cocaine in front of his police vehicle about five minutes after Defendants were placed under arrest.  [Ex. 1.]

35.     Upon finding the package of cocaine, Officer Chavez informed the Defendants that they were under arrest, and another state police officer arrived to assist in effecting the arrest.

36.     The duration of the traffic stop from the time the white Ford pickup truck pulled over until the time Defendants were placed under arrest was approximately 30 minutes.

37.     After being placed under arrest at the scene, Defendants were taken to the state police station in Albuquerque.

38.     While at the police station, Sergeant Mendez of the New Mexico State Police visited separately with each of the two Defendants for the purpose of advising them of their rights under Miranda v. Arizona, 384 U.S. 436 (1966), and determining whether they wished to invoke or waive those rights.

39.     Sergeant Mendez's visit with Defendant Moreno took place in a conference room at the police station while Defendant Moreno was not handcuffed, subjected to a show of force, or deprived of basic necessities such as food, water, or the ability to go to the bathroom.

40.     During this visit, Sergeant Mendez began by reading Defendant Moreno his Miranda rights and presenting these rights on written forms available in both Spanish and English.

41.     After being advised of his Miranda rights, Defendant Moreno responded by knowingly and voluntarily waiving these rights, making a statement, and consenting to the

-8-

search of his trailer; Defendant Moreno's waiver of rights and consent to search are documented on forms which were admitted into evidence at the hearing.  [Ex. 6, 11.]

42.     After receiving Defendant Moreno's consent to search the trailer, DEA Agent Richard Rosa went to the trailer where Defendant Moreno resided and found a number of juveniles present without an adult.

43.     Agent Rosa waited for an adult to arrive at the trailer, and eventually a woman who identified herself as Defendant Moreno's spouse arrived.

44.     Agent Rosa proceeded to inform Defendant Moreno's spouse in Spanish that Defendant Moreno had been taken into custody and had given his consent to search the trailer, but before doing so Agent Rosa wanted to ask for her permission as well.

45.     Defendant Moreno's spouse gave her consent to search the trailer, whereupon Agent Rosa proceeded to search the trailer for approximately 40 minutes.

46.     Defendant Moreno's spouse was not taken into custody at any time before or during the search, nor was she subjected to any threats or coercion by the agents conducting the search.

47.     After visiting with Defendant Moreno but before Agent Rosa's search of the trailer, Sergent Mendez separately visited with Defendant Chavez in the police station conference room under the conditions noted above (*i.e.*, no handcuffs or firearms and no deprivation of basic necessities such as food, water, or the ability to go to the bathroom).

48.     When Sergeant Mendez advised Defendant Chavez of his Miranda rights, Defendant Chavez responded by invoking his right to counsel, and therefore Sergeant

Mendez discontinued his interview of Defendant Chavez before this Defendant made any incriminating statements at the police station.

49.     Within a few minutes thereafter, Detective Melton of the DEA Task Force came into the room with Sergeant Mendez and informed Defendant Chavez that he would be taken into federal custody and transported to jail as soon as the officers were finished processing the paperwork for the arrest.

50.     The officers did not attempt to obtain counsel for Defendant Chavez while he was at the police station awaiting transfer to the jail, nor is it their standard practice to do so.

51.     The officers' purpose in advising Defendant Chavez that he would be taken into federal custody and transported to jail was not to invoke an incriminating response or induce him to waive any of his rights; rather, such advice was simply a good-faith effort to keep Defendant Chavez oriented and informed of his whereabouts and custodial status.

52.     About 30 to 45 minutes after Defendant Chavez invoked his Miranda rights at the police station, and while the officers were still in the process of completing paperwork necessary to book the Defendants into jail, Defendant Chavez caught Sergeant Mendez's attention and asked if he could change his mind and give a statement.

53.     Upon receiving this information, Sergeant Mendez consulted with Detective Melton; both Sergeant Mendez and Detective Melton subsequently informed Defendant Chavez that they could not take a statement from him because he had invoked his right to counsel.

-10-

54.     After the officers finished speaking to Defendant Chavez and indicated that their conversation was over, Defendant Chavez spontaneously uttered a statement to the effect that he had made two mistakes that day:   one was getting involved in a drug transaction, and the other was invoking his right to counsel instead of giving a statement.

55.     Based on the totality of the circumstances within the collective knowledge of the officers and agents, Officer Chavez's initial seizure of the white Ford pickup truck and its occupants was supported by both reasonable suspicion and probable cause to believe the truck contained a kilogram of cocaine and that its occupants knowingly possessed that cocaine with the intent to distribute it.

56.     The additional information that Officer Chavez obtained during the initial phase of the traffic stop corroborated the DEA agents' suspicion that Defendants were engaged in a drug crime and also provided probable cause to believe that Defendant Chavez committed the offense of driving his truck without proof of insurance.

57.     Under the totality of the circumstances, Officer Chavez did not exceed the permissible scope or duration of the traffic stop when he prolonged the stop in order to ask for consent and complete his search of the white Ford pickup truck, including the bucket of nails where he found the package of cocaine.

58.     Under the totality of the circumstances, both Defendants knowingly and voluntarily consented to the search of the white Ford pickup truck, including the nail bucket located in the bed of the truck.

59.     Officer Chavez's search of the pickup truck and the open bucket located in the truck's bed was supported by probable cause to believe that the truck and/or its contents contained drug evidence, as well as the Defendants' knowing and voluntary consent.

60.     Upon finding the package of cocaine, Officer Chavez had probable cause to arrest the occupants of the white Ford pickup truck.

61.     Defendants were informed of their <u>Miranda</u> rights before the officers or agents engaged them in any custodial interrogation.

62.     Under the totality of the circumstances, the statement Defendant Chavez made in the presence of Detective Melton was not the product of custodial interrogation and was not taken in violation of this Defendant's <u>Miranda</u> rights or otherwise tainted by any prior illegality on the part of the officers.

63.     Under the totality of the circumstances, Defendant Moreno's post-arrest statements and his consent to search the trailer where he resided were knowingly and voluntarily given after being informed of his <u>Miranda</u> rights; these statements and consent also were not tainted by any prior illegality on the part of the officers.

64.     Under the totality of the circumstances, Defendant Moreno's spouse had the authority to consent to the search of the trailer, and she knowingly and voluntarily did so.

65.     Defendant Moreno did not demonstrate a property interest or a legitimate expectation of privacy in the bucket of nails where the officer searched and discovered the package of cocaine.

## II.   <u>LEGAL ANALYSIS AND CONCLUSIONS OF LAW</u>

In their motion papers, Defendants' contend that all of the incriminating evidence gathered by the Government in this case must be suppressed as "fruit of the poisonous tree" because Officer Chavez lacked reasonable suspicion or probable cause to conduct a traffic stop of the white Ford pickup truck in which they were traveling, and because Officer Chavez exceeded the permissible scope and duration of a traffic stop in a manner that invalidated any consent the Defendants may have given for the searches that followed. Defendant Chavez further contends that the statement he made in the presence of Detective Melton and Sergeant Mendez must be suppressed because it was elicited in violation of his <u>Miranda</u> rights.  For the reasons set forth below, I conclude that these contentions do not have merit, and therefore Defendants' motions are denied.

The Fourth Amendment to the United States Constitution protects Defendants' right to be secure in their persons and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness."  <u>United States v. Chadwick</u>, 433 U.S. 1, 12 (1977), <u>overruled in part on other grounds</u>, <u>California v. Acevedo</u>, 500 U.S. 565 (1991).  In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996).  Thus, Defendants were seized within the

meaning of the Fourth Amendment when Officer Chavez conducted a traffic stop of the white Ford pickup truck in which they were traveling.  See id.

Ordinarily, the seizure occasioned by a routine traffic stop is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).  Further, the reasonableness of such a seizure is not measured by the subjective intentions or motives of the defendants or the officer performing the seizure, and thus it does not matter that Officer Chavez did not disclose to Defendants the real reasons for performing the traffic stop.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001).

Nevertheless, Defendants contend that the initial traffic stop was unreasonable because Officer Chavez did not observe any traffic or equipment violation and was not subjectively aware of all the details of the DEA investigation at the time he performed the stop.  In response to this contention, the Government claims that Officer Chavez was entitled to rely on the collective knowledge of the DEA agents as to whether there was probable cause to believe that Defendants were preparing for a drug transaction involving the sale of one kilogram of cocaine arranged through the confidential source.  According to the Government, the probable cause established by the DEA agents was sufficient to satisfy the Fourth Amendment, regardless of Officer Chavez's subjective knowledge.

-14-

Defendants further assert that Officer Chavez cannot rely on the knowledge of the DEA agents to establish probable cause because those agents did not communicate enough information to him about the details of the alleged crime. To support this contention, Defendants cite United States v. Shareef, 100 F.3d 1491, 1505-06 (10th Cir. 1996), where the Tenth Circuit declined to allow a group of officers to rely on their collective knowledge to establish probable cause because that knowledge was scattered among two or more officers, none of whom knew the significance of the information they possessed or communicated their piece of the puzzle to other officers. See id.

I do not read Shareef as abolishing the "fellow officer" rule, under which an officer conducting a search or seizure at the direction of other officers need not be subjectively aware of all the information required to establish probable cause and may instead rely on information known only by those other officers. See United States v. Hensley, 469 U.S. 221, 231 (1985); United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997); United States v. Morgan, 936 F.2d 1561, 1569 (10th Cir. 1991). Under this rule, the question is not what details of the undercover investigation Officer Chavez knew or was told at the time the DEA agents directed him to perform the traffic stop, but whether at least one of the DEA agents involved in directing the stop had enough information to establish reasonable suspicion or probable cause to justify this action. See Hensley, 469 U.S. at 231; United States v. Celio, 945 F.2d 180, 182-84 (7th Cir. 1991). And while the DEA agents limited their communications with Officer Chavez, they nevertheless worked closely enough and shared

-15-

enough information within their own circle of agents and task force members to avoid the situation described in Shareef, 100 F.3d at 1505-06.

Specifically, the DEA agents were aware of telephone conversations between the confidential source and Defendant Moreno in which the two men scheduled the sale of one kilogram of cocaine in Santa Rosa, New Mexico later that morning.  These monitored telephone conversations also revealed to the DEA agents that Defendant Moreno said he would be traveling with a driver and gave a telephone number that belonged to Defendant Chavez.  On the morning of the traffic stop, the DEA agents observed Defendant Moreno leave his residence and travel with a driver (Defendant Chavez) in a manner that corresponded to what was stated in the monitored telephone communications with the confidential source.  Thus, under the totality of the circumstances known to at least one of the DEA agents working closely together, the traffic stop performed by Officer Chavez at the DEA agents' direction was supported by probable cause to believe that Defendants were carrying contraband in the white Ford pickup truck.   See United States v. Parra, 402 F.3d 752, 764-66 (7th Cir. 2005).

The next question is whether Officer Chavez exceeded the permissible boundaries of the traffic stop.  Before issuing a traffic citation, the Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively

reasonable concerns about the officer's safety, see United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc).  But the general rule is that a routine traffic stop must end promptly as soon as the traffic citations have been issued and the driver's license, registration, and insurance information have been reviewed and found to be in proper order.  See Hunnicutt, 135 F.3d at 1349.

There are two relevant exceptions to this general rule.  "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occuring."  Id.  "Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter."  Id.  The first of these exceptions applies in this case.

In particular, Officer Chavez's routine questioning during the traffic stop revealed that Defendant Chavez did not have proof of current insurance for his vehicle.  Regardless of whether there was any problem with the vehicle's headlights, Defendant Chavez's admission that his insurance had expired gave the officer reason to prolong the stop for the period of time necessary to prepare and issue a traffic citation.  During this time, the officer was free to ask Defendants about their travel plans.

The Defendants' responses to this line of questioning did not dispel a reasonable suspicion that they were on their way to Santa Rosa to complete the sale of a kilogram of cocaine, as suggested by the monitored telephone communications between the confidential source and Defendant Moreno.  Neither Defendant could provide the officer with specific

details (such as a name, address, or telephone number) that would provide a plausible, alternative explanation of why they were traveling together to Santa Rosa that day.

Hence, under the totality of the circumstances, Officer Chavez had probable cause to prolong the traffic stop for the purpose of investigating whether Defendants were carrying drugs in the white Ford pickup truck.  During the period of this initial investigation, both Defendants consented to the search of the truck and its contents.

Before addressing Defendants' objections to the validity of their consent to search the truck, I must first examine whether each Defendant has standing to challenge this search. In order to challenge the search of the vehicle (as opposed to the detention of his person), it is each Defendant's burden to show that he has an interest in the vehicle that is protected by the Fourth Amendment.  See United States v. Arango, 912 F.2d 441, 444 (10th Cir. 1990); United States v. Rascon, 922 F.2d 584, 587 (10th Cir. 1990).

The existence of a cognizable Fourth Amendment right to be free from unreasonable searches and seizures of a motor vehicle depends on two factors:  whether the individual in question has exhibited a subjective expectation of privacy in the vehicle, and whether society recognizes that subjective expectation as reasonable.   See Rascon, 922 F.2d at 586. Although formal documentation (such as a certificate of title or registration form) is not necessarily required in order to establish proof of ownership or legitimate possession, mere possession or control of the vehicle alone is not sufficient to satisfy this test.  See United States v. Jefferson, 925 F.2d 1242, 1249-50 (10th Cir. 1991); Arango, 912 F.2d at 445.

-18-

In this case, Defendant Chavez produced documentation and made statements during the traffic stop that give rise to a reasonable expectation of privacy in the truck and its contents.  The same is not true, however, for Defendant Moreno, who was occupying the passenger seat at the time of the stop.  Defendant Moreno disclosed no details of his association with the truck or Defendant Chavez which would support a legitimate expectation of privacy in the truck or its contents, except for a few personal effects in the truck's passenger compartment, such as the jacket he retrieved while Officer Chavez was questioning him.

To the extent that either Defendant had a reasonable expectation of privacy in the areas of the white Ford pickup truck that Officer Chavez searched, it becomes the Government's burden to show that the search of those areas was not unreasonable under the Fourth Amendment.  The Government has met this burden in at least two different ways.

First, as noted above, the DEA agents already developed probable cause to believe Defendants were carrying a kilogram of cocaine somewhere in the truck, and the information revealed to Officer Chavez prior to the search did not dispel the suspicion that Defendants were on their way to Santa Rosa to complete a drug transaction.  Under the "automobile exception" to the warrant requirement, probable cause alone is legally sufficient to support the search of the white Ford pickup truck, even if there was a delay of approximately half an hour between the time the vehicle was stopped and the time of the search.  See Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); Florida v. Meyers, 466 U.S. 380, 382 (1984);

Michigan v. Thomas, 458 U.S. 259, 261 (1982) (per curiam); Texas v. White, 423 U.S. 67, 68 (1975) (per curiam).

Second, even if probable cause for the search was somehow lacking at that point, the Government may prove that the search did not violate the Fourth Amendment by showing that Defendants knowingly and voluntarily consented to it.  In order to meet these requirements, the Defendant's consent must be unequivocal and specific; it must be freely and intelligently given; and there must be no duress or coercion.  See United States v. Drayton, 536 U.S. 194, 206-07 (2002); United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567 (10th Cir. 1993).

Defendants assert that their consent was not knowing and voluntary because they remained under detention at the time they reviewed the consent forms provided by Officer Chavez.  To support this contention, they point out that when Defendant Chavez asked what would happen if he did not consent to the search, Officer Chavez stated that he would run his dog "Chica" around the exterior of the vehicle.  This statement by Officer Chavez may have indicated to Defendants that they were not free to leave even if they did not consent to the search.

The fact that a person is still being detained by police at the time a consent to search is obtained does not necessarily render his or her consent involuntary, see Rodriguez-Garcia, 983 F.2d at 1567, nor does it create a presumption that the consent to search is involuntary, see United States v. Price, 925 F.2d 1268, 1270-71 (10th Cir. 1991).  Rather, the Court must consider the totality of the circumstances.  See Drayton, 536 U.S. at 207.

In this case, the totality of the circumstances indicates that Defendants' consent to search the truck was knowing and voluntary even if they were not free to leave the scene at the time it was given.  In addition to telling Defendant Chavez what would happen if he chose not to consent to the search, Officer Chavez also stated that Defendants were not required to consent to the search and that they could tell him to stop the search or place limits on the scope of the search at any time.  The officer also requested consent both orally and in writing, and he gave Defendants their choice of consent forms in English and Spanish. There is no indication that Defendants could not understand the officer's request or raised any objection to it.  Further, Defendants' documents and other personal property had been returned to them at the time of the request, and there is no indication of an express or implied show of force by the officers present at the scene that would suggest the consents were obtained under coercion or duress.  The officers' only physical contact with the Defendants before the search was a very cursory patdown search, and neither Defendant was physically restrained before or during the search.  In light of these circumstances, I conclude that Defendants' consent to the search of the vehicle was knowing and voluntary.  See Rodriguez-Garcia, 983 F.2d at 1567-68.

After the Defendants consented to the search of the white Ford pickup truck, Officer Chavez was able to locate the cocaine within a matter of minutes by simply climbing into the truck's open bed, looking into a nail bucket, and emptying the bucket in order to retrieve the package bearing the cocaine.  This relatively straightforward task did not depend on the reliability of the officer's dog "Chica" or any specialized equipment.  And there is no doubt

that Officer Chavez's discovery of the package of cocaine gave him probable cause to conduct a full custodial arrest of both Defendants and a more thorough search of the truck, with the assistance of other officers.  Because the entire detention and search occasioned by Officer Chavez's traffic stop met the Fourth Amendment's requirement of reasonableness, the exclusionary rule provides no basis for suppressing the evidence that resulted from these activities, and Defendants' motion to suppress this evidence must be denied.  See United States v. Massie, 65 F.3d 843, 849 (10th Cir. 1995).

Further, Defendants have not shown that their consent to search, or any of the evidence or statements subsequently obtained by the Government, was the product of any prior unlawful conduct by the officers in question.  "A party seeking exclusion of evidence on Fourth Amendment grounds must demonstrate both actual police misconduct that violated the defendant's Fourth Amendment rights, and that the evidence to be excluded was in fact a product of the police misconduct."  United States v. Williams, 356 F.3d 1268, 1272 (10th Cir. 2004) (citing United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir.2001) and United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.2000)).  "'Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the  taint of the unlawful conduct.'"  DeLuca, 269 F.3d at 1132 (quoting Nava-Ramirez, 210 F.3d at 1131) (citations omitted); see Williams, 356 F.3d at 1273 (citing Wong Sun v. United States, 371 U.S. 471, 487-88

(1963)).  As Defendants have not met the first two requirements of this test, there is no basis for suppressing the evidence obtained during the ensuing searches and seizures as "fruit of the poisonous tree."

Nevertheless, the Court must still examine whether there is any independent basis for suppressing evidence gathered as a result of Defendants' custodial interrogation or the subsequent search of the trailer where Defendant Moreno resided.    Unlike automobile searches, probable cause alone does not satisfy the Fourth Amendment's requirements for searching a person's residence, because a person has a greater expectation of privacy in his home than in his vehicle.  Compare Payton v. New York, 445 U.S. 573, 585-89 (1980), with California v. Carney, 471 U.S. 386, 390-93 (1985).  Probable cause also is not the constitutional standard for permitting custodial interrogation, because statements obtained during such interrogation implicate the Defendants' rights under the Fifth and Fourteenth Amendments.

There are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence:  the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."  Dickerson v. United States, 530 U.S. 428, 433 (2000).  The Fifth Amendment inquiry applies to "the admissibility in evidence of any statement given during custodial interrogation of a suspect" and depends on whether the police provided the suspect with the four warnings required under Miranda v. Arizona, 384 U.S. 436 (1966).  Dickerson, 530 U.S. at 435.  In these situations the Government generally bears the burden of proving that a defendant's waiver of his or her Miranda rights is knowing

and voluntary.  See United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997).  But
"[a]n express statement of waiver by the defendant is not required; instead, waiver can be
inferred from the defendant's actions and words."  Id.

Apart from the Fifth Amendment standards articulated in Miranda and its progeny,
the admissibility of a statement obtained from a suspect by police officer may still be
challenged on due-process grounds.  See Dickerson, 530 U.S. at 434.  The due-process
inquiry "examines 'whether a defendant's will was overborne' by the circumstances
surrounding the giving of a confession."  Id. (quoting Schneckloth v. Bustamonte, 412 U.S.
218, 226 (1973)).  "Whether voluntary consent was given is a question of fact, determined
by the totality of the circumstances and reviewed for clear error."  United States v. Zubia-
Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001).  To meet its burden of proving that
Defendant's consent was voluntary, the Government must present clear and positive
testimony that consent was unequivocal and specific and freely given without implied or
express duress or coercion.  See id.  "This burden cannot be discharged by showing no more
than acquiescence to a claim of lawful authority."  Bumper v. North Carolina, 391 U.S. 543,
548-49 (1968); accord United States v. Leary, 846 F.2d 592, 598 (10th Cir. 1988).

In this case, the witnesses at the suppression hearing credibly testified that they fully advised
both Defendants of their Miranda rights both orally and in writing before taking any post-arrest
statements from them.  The evidence of record also supports my finding that Defendant Moreno
knowingly and intelligently waived his Miranda rights before producing the post-arrest statements and
documents that were introduced at the suppression hearing.  In addition, both Defendant Moreno and

his spouse knowingly and voluntarily consented to the search of his residence under the standards articulated above.  Thus, Defendants' motions provide no basis on which to suppress any evidence obtained as a result of Defendant Moreno's custodial interrogation at the police station or the search of his residence.[3]  See United States v. Gell-Iren, 146 F.3d 827, 830-31 (10th Cir. 1998).

In a separate motion, Defendant Chavez seeks to suppress a statement he made in the presence of Detective Melton and Sergeant Mendez after invoking his Miranda rights at the police station.  According to the evidence presented at the suppression hearing, this statement was not made in response to any questioning by the officers.

Nevertheless, I recognize that a conversation can amount to "interrogation" for purposes of Miranda even when the officer does not ask questions.  See United States v. Rambo,  365 F.3d 906, 909-10 (10th Cir. 2004).  "[I]nterrogation encompasses not only questioning but 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  Id. at 909 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)) (footnote omitted).

In this case, Defendant Chavez points to two categories of remarks by the officers which he views as part of an effort to provoke an incriminating response from him.  The first

---

[3]There may be separate issues concerning the admissibility of Defendant Moreno's post-arrest statements at trial based on the Sixth Amendment's Confrontation Clause.  See Crawford v. Washington, 541 U.S. 36, 68-69 (2004) (police interrogations), Bruton v. United States, 391 U.S. 123, 126-28 (1968) (accomplice confessions).  Neither Defendant has raised such issues in their motion papers, and the deadline for filing motions in limine has expired.  Therefore, the Court will not address these separate Confrontation Clause issues in this *Memorandum Opinion and Order*.

category encompasses the officers' remarks explaining to this Defendant that he would be taken into federal custody and transported to jail when the officers were finished completing the paperwork for the arrest.  Taken in context, however, these are the type of remarks that are normally attendant to an arrest involving a joint effort by state and federal law-enforcement officials.  They are simply part of a good-faith effort to keep the Defendant informed of his whereabouts and cannot reasonably be construed as provoking an incriminating response.  In fact, Defendant Chavez gave no such response at the time these remarks were made.

The second category of remarks that Defendant Chavez views as unduly provocative encompasses the words the officers spoke when they declined Defendant Chavez's invitation to reinitiate a conversation after he invoked his <u>Miranda</u> rights at the police station.  Both officers credibly testified that Defendant Chavez spontaneously uttered a statement in their presence after they finished explaining to him why they could not take a statement from him at that juncture.  To conclude that this spontaneous statement must be suppressed under <u>Miranda</u> and its progeny, the Court would first have to find that by declining Defendant's request to make a post-arrest statement, the officers were in fact provoking him to make such a statement.  Such a finding would be self-contradictory and absurd when the officers' remarks are taken in the context presented here.

For these reasons, the statement at issue here is not analogous to the statements at issue in <u>Rambo</u>, 365 F.3d at 909-10, or <u>Innis</u>, 446 U.S. at 301.  Rather, Defendant Chavez's statement is more analogous to the unprovoked statements that the Tenth Circuit found to be

admissible in United States v. Nelson, 450 F.3d 1201, 1211-12 (10th Cir. 2006), and United States v. De La Luz Gallegos, 738 F.2d 378, 380-81 (10th Cir. 1984).  Like the statements at issue in the latter cases, Defendant Chavez's post-arrest statement was "volunteered, unprovoked and spontaneous."  De La Luz Gallegos, 738 F.2d at 381.  It was "not foreseeable by the . . . agent[s]" and was not "the product of any subtle form of interrogation."  Id.  Further, the conversation which preceded the statement was provoked by Defendant Chavez, not the officers, and there was no attempt by the officers to continue the conversation.  See Nelson, 450 F.3d at 1211.  Under these circumstances, where the officers "scrupulously honored defendant's request for an attorney," the fact that Defendant Chavez made such a request "is not itself sufficient to prohibit the use of spontaneous declarations not brought about by the prompting of law enforcement officials."  De La Luz Gallegos, 738 F.2d at 381.

For all of the above reasons, I conclude that Defendant Chavez's post-arrest statement was not the product of custodial interrogation and need not be suppressed under the exclusionary rule.  Accordingly, Defendant Chavez's motion to suppress his statement is denied.[4]

---

[4]The Court's ruling that Defendant Chavez's statement need not be suppressed under the exclusionary rule does not necessarily mean that it is admissible at trial.  In particular, the Court's ruling on Defendant's motion should not be construed as giving the Government free reign to comment or elicit testimony at trial concerning a Defendant's invocation of his right to remain silent. See Nelson, 450 F.3d at 1212.  The Court defers ruling on the admissibility of Defendant Chavez's statement until the Government proffers an explanation of how the statement may be presented to a jury without any mention of this Defendant's invocation of his constitutional rights.

III.     **CONCLUSION**

Because the Government met the applicable requirements of the Fourth, Fifth, and

Fourteenth Amendments with respect to the searches and seizures that Defendants challenge

in their motions, the exclusionary rule does not provide any basis for suppressing the

evidence or statements that were produced as a result of those activities.

**IT IS THEREFORE ORDERED** that *Defendant Victor Chavez's Motion to*

*Suppress Evidence* [Doc. 36] joined by Defendant Servando Moreno [Doc. 41] is **DENIED**

as to both Defendants.

**IT IS FURTHER ORDERED** that *Defendant Victor Chavez's Motion to Suppress*

*Statements and Evidence* [Doc. 47] is **DENIED.**

**SO ORDERED**, this 8th day of September, 2006, in Albuquerque, New Mexico.

_____

**M. CHRISTINA ARMIJO**
United States District Judge

-28-